GARY R. BROWN, United States Magistrate Judge:
On September 21, 2014, a group of vacationers, including many visitors from foreign countries travelling with friends and family members, departed Washington, D.C., eventually intending to return to the New York area. Suddenly and unexpectedly, tragedy struck, as the tour bus on which they were travelling overturned while exiting the off ramp to U.S. Route 13 in New Castle County, Delaware.
In that instant, as the vehicle became a twisted tangle of metal, passengers were thrown about the lumbering transport. Two women, seated in seats 32 and 33, found themselves propelled along the length of the bus, slamming into wreckage near the driver's seat. Several passengers, impelled through glass windows, fared even worse, including at least one woman who was crushed as the bus rolled over her. In all, the accident claimed at least 40 victims, all claimants in this interpleader action. Among the victims, there were three fatalities. Many others were severely injured, some disabled, and every victim suffered severe trauma, sustaining injury to themselves and witnessing the death and mutilation of their friends, family and fellow travelers. According to press reports, the driver was charged and convicted of operating the bus in a hazardous manner.
The tour bus, owned by AM USA Express Inc., and operated by one of its employees, carried a total of $5 million in liability coverage insurance ("the Fund"). This $5 million, while a substantial sum, proves insufficient to fully compensate the victims for their losses.
Charged with the responsibility of determining the fair, equitable and just distribution of the Fund, the Court reviewed the claim reports and medical records and met with most of the claimants over several days. Many claimants appeared in person, several appeared by telephone, letter or pre-recorded video, and several claims were handled through attorney proffer. The hearing, conducted in several languages, vividly detailed the injuries incurred by the claimants.
During the proceedings, amid the descriptions of the grief and loss, there was evidence of selflessness, courage and spirit.
*248 The records contain accounts of individuals who, though injured, endeavored to aid their family members and fellow travelers in the minutes following the accident. There were descriptions of heroic efforts by first responders, medical personnel and doctors, without whom this tragedy would have resulted, undoubtedly, in even greater loss. Local church groups organized volunteer families in the vicinity to provide shelter to the injured in their homes for months, while the victims continued medical treatments and recovered sufficiently to return home. One claimant from Australia, who spent months in the United States receiving medical care because her injuries prevented her from travelling home, noted:
Living in the [volunteers' homes] with other bus victims, we all helped each other and relied on volunteers to take us to medical appointments and shopping for food ....
DE 150-2. Even today, two and a half years after the accident, several victims remain so preoccupied with the suffering of their loved ones that they were nearly incapable of describing their own injuries. The claimants demonstrated notable courage and resilience in grappling with their injuries, caring for their families, and getting on with the difficult process of healing and moving forward.
The discussion below concerns several legal and evidentiary issues relating to specific claimants and groups of claims. Following thereafter is a chart with the specific findings and awards as to each of the claimants.
The Wrongful Death Cases/Choice of Law
Three women died as a result of injuries sustained in the crash: Idil Bashi, 30, a resident of Turkey; Hua Yu Chen, 54, a resident of New York; and Jyotsna Poojari, 43, a resident of India. Ms. Bashi died in the hospital after approximately seven hours and several surgeries. There is substantial evidence demonstrating that she was alert and conscious during much of this period. Ms. Poojari, after repeated surgical intervention, lingered for 11 days. There was evidence that she remained conscious for at least part of this period and was, at least at times, suffering extreme pain.
Ms. Chen was pronounced dead at the scene of the crash, though not until nearly two and a half hours after the accident. There is no evidence concerning whether or not she survived the crash for any period. Inferentially, however, based upon varying descriptions of heroic rescue efforts-which included airlifting seriously ill patients from the scene-it seems unlikely that Ms. Chen survived the impact. In fact, documents submitted-including details of the injuries sustained and the near immediate identification of a single fatality from the accident-give rise to an inference that Ms. Chen was, most likely, killed instantly. See generally DE 124.
Survivors of all three of these victims appeared at the hearing. Ms. Bashi's husband, himself a victim of the accident, sustained relatively minor physical injuries. However, having borne witness to his wife's death over the course of hours, he was devastated by the accident. See, e.g. , Tr. at 46 ("[E]veryone lost something ... I lost everything.").[1] Ms. Chen's husband, son and daughter-in-law (the latter two being residents of Delaware) appeared before me to describe the significant loss they have suffered. None were directly involved in the accident nor witnessed any *249 portion of it. Finally, Mr. Poojari appeared, describing how he travelled from Africa, where he was working, to remain at his wife's bedside during her final days. All of these survivors sustained grievous loss.
Choice of Law
The first question, briefed by several parties, is the question of choice of law. The principal question here is whether to apply the law of New York, which represents, at a minimum, the domicile of the defendants as well as the point of departure and return for the bus tour. None of the decedents resided in Delaware. Ms. Chen, who resided in New York, intended to visit her son and daughter-in-law, both Delaware residents, but neither is a claimant herein. Ms. Bashi and Ms. Poojari both resided abroad.
The primary "conflict" between the laws of these two states is the amount of compensation that may be awarded to survivors of decedents. The New York State legislature has long limited the survivors to pecuniary damages; intangibles, such as mental anguish and grief, are not subject to recovery. N.Y. Est. Powers & Trusts § 5-4.3 ("[D]amages awarded to the plaintiff may be ... fair and just compensation for the pecuniary injuries resulting from the decedent's death to the persons for whose benefit the action is brought."); Tilley v. Hudson River R.R. Co. , 24 N.Y. 471, 476 (1862) ("[T]he word pecuniary was used in distinction to those injuries to the affections and sentiments which arise from the death of relatives, and which, though most painful and grievous to be borne, cannot be measured or recompensed by money. It excludes, also, those losses which result from the deprivation of the society and companionship of relatives, which are equally incapable of being defined by any recognized measure of value.").[2] Delaware law, by contrast, expressly provides for recovery for the mental anguish of survivors. Del. Code Ann., Survival of Actions & Causes of Action; Wrongful Death Actions, tit. 10, § 3701.
The parties agree that an "interest analysis" governs, meaning that a determination must be made as to which sovereign has the greater interest in applying its law to the matter in dispute. Babcock v. Jackson , 12 N.Y.2d 473, 474, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) ("The determination ... depends on the law of the jurisdiction ... which has the strongest interest therein."). The parties are also in accord that the law differentiates between "conduct regulating" and "loss allocation" rules. Elson v. Defren , 283 A.D.2d 109, 726 N.Y.S.2d 407, 412 (2001) (" 'An immediate distinction was drawn between laws that regulate primary conduct (such as standards of care) and those that allocate losses after the tort occurs (such as vicarious liability rules).' " (quoting Cooney v. Osgood Mach., Inc. , 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993) )). And while the parties have argued otherwise, it is clear that "wrongful death statutes are loss allocating because they assign liability after a tort has occurred." Bak v. Metro-North R.R. Co. , 100 F. Supp. 3d 331, 338 (S.D.N.Y. 2015) (citing Padula v. Lilarn Props. Corp. , 84 N.Y.2d 519, 522-23, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994) ) (citing wrongful death statutes as an example of loss allocation rule). Under the three-part test set forth in Neumeier v. Kuehner , 31 N.Y.2d 121, 128, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972), where the tortfeasor and decedent share a common domicile-which is the situation regarding *250 Ms. Chen-then that state's law (here New York) applies.[3] Under the third prong of that test, in the other two situations, in which the decedent and tortfeasor are from differing domiciles:
the rule is necessarily less categorical. Normally, the applicable rule of decision will be that of the state where the accident occurred but not if it can be shown that displacing that normally applicable rule will advance the relevant substantive law purposes without impairing the smooth working of the multi-state system or producing great uncertainty for litigants.
Neumeier , 335 N.Y.S.2d at 70, 286 N.E.2d 454.
Counsel has cited Edwards v. Erie Coach Lines Co. , 17 N.Y.3d 306, 318, 929 N.Y.S.2d 41, 952 N.E.2d 1033 (2011) as authority supporting the application of Delaware law here. DE 170. Edwards considered the choice of law issues arising from a massive bus accident in Geneseo, New York involving victims from Ontario, Canada and, as relevant herein, a trailer company domiciled in Pennsylvania. In deciding to apply New York law, the court in Edwards noted:
Here, by contrast, there was no cause to contemplate a jurisdiction other than New York, the place where the conduct causing injuries and the injuries themselves occurred. The trailer defendants did not ask Supreme Court to consider the law of their domicile, Pennsylvania, and they had no contacts whatsoever with Ontario other than the happenstance that plaintiffs and the bus defendants were domiciled there.
Edwards , 17 N.Y.3d at 331, 929 N.Y.S.2d 41, 952 N.E.2d 1033. In making its determination that the Ontario liability cap should apply to a suit brought between co-domiciliaries of Ontario for a New York-based accident, Edwards concludes that " 'the locus jurisdiction has at best a minimal interest in determining the right of recovery or the extent of the remedy in an action by a foreign domiciliary for injuries resulting from the conduct of a codomiciliary that was tortious under the laws of both jurisdictions.' " Edwards , 17 N.Y.3d at 330, 929 N.Y.S.2d 41, 952 N.E.2d 1033 (quoting Schultz v. Boy Scouts of Am. , 65 N.Y.2d 189, 198, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) ).
Here, where no Delaware residents were involved in the accident, Delaware would appear to have little interest in application of its liability rules to this incident. In transferring this action to this Court, the U.S. District Court for the District of Delaware considered the "ties to the State of Delaware," which the judge there considered "tenuous at best." DE 54 at 2. And while New York has refined its approach in Neumeier and other cases, the Edwards court noted that the Babcock court had, in deciding to apply New York law, considered that "the trip began and was to end in New York, where the car was garaged, licensed and insured, and where the driver-passenger relationship arose." Edwards , 17 N.Y.3d at 319, 929 N.Y.S.2d 41, 952 N.E.2d 1033. The following language from Babcock has particular application here:
Although the rightness or wrongness of [the driver's] conduct may depend upon the law of the particular jurisdiction through which the automobile passes, the rights and liabilities of the parties which stem from their guest-host relationship should remain constant and not *251 vary and shift as the automobile proceeds from place to place. Indeed, such a result ... accords with the interests of the host in procuring liability insurance adequate under the applicable law, and the interests of his insurer in reasonable calculability of the premium.
Babcock , 12 N.Y.2d at 483-84, 240 N.Y.S.2d 743, 191 N.E.2d 279 (internal quotations omitted). Indeed, where New York was the point of departure and return for the subject trip, the contracting and other terms of the agreement were presumably negotiated in New York, and the state's vehicular and insurance laws primarily governs the terms of coverage (though the liability minimum may, in fact, be the result of federal law), it would seem that New York has a greater interest in effecting its policies than Delaware in these circumstances. Thus, the Court finds that New York law applies.
Conscious Pain and Suffering in the Wrongful Death Cases
Fixing compensation amounts in these cases represents a daunting task. "Assigning a dollar value to a person's life might seem impossible, not to mention unthinkable," The New York Times observed.[4] Managers of the 9/11 fund, used to compensate victims of the World Trade Center attacks, considered economic loss, created an offset for life insurance proceeds and then added set amounts of $250,000 for each victim plus another $100,000 for each surviving wife and child.[5]
The amount of pain and suffering sustained by each of the decedents here varied widely, and there are some guideposts that helped in the calculation of damages. In Twersky v. Busche , 37 A.D.3d 704, 830 N.Y.S.2d 725, 726 (2007), a trial court reduced a $1 million jury verdict to $650,000 for the pain and suffering incurred by a decedent pedestrian who survived for several hours and was conscious during part of that time. The Second Department reversed, finding that "the $1,000,000 jury award did not deviate[ ] materially from what would be reasonable compensation." Id. ; see Dowd v. N.Y.C. Transit Auth. , 78 A.D.3d 884, 911 N.Y.S.2d 460, 461 (2010) (conscious pain and suffering award of $1,750,000 deemed excessive for bus crash victim who survived for 2.5 hours; court recommended reduction to $1,200,000); cf. Espinal v. Vargas , 101 A.D.3d 1072, 956 N.Y.S.2d 504, 504 (2012) (upholding $250,000 pain and suffering award where decedent survived 39 minutes). These cases, similar to the facts of claimant Bashi's case, prove somewhat helpful.
Ms. Poojari was conscious at the scene and while being airlifted to the hospital, according to the records provided. See, e.g. , DE 125, Prehospital Care Report ("[P]atient would respond to verbal stimuli and follow commands" while in aircraft). Three hours later, she remained responsive to verbal stimuli. Id. An hour after that, she continued to cry, withdraw from touch and spontaneously open her eyes. See DE 125, Trauma Flowsheet. The next day, records show, she was "chemically paralyzed" and "sedated." Id. By September 23, two days after the accident, she was adjudged neurologically "unresponsive." Id. At the hearing, her husband *252 reported that, during her stay in the hospital, she continued to communicate by blinking in response to questions. Tr. at 60; see Tr. at 53.
"In determining damages for conscious pain and suffering experienced in the interval between injury and death, when the interval is relatively short, the degree of consciousness, severity of pain, apprehension of impending death, along with duration, are all elements to be considered." Regan v. Long Island R.R. Co. , 128 A.D.2d 511, 512 N.Y.S.2d 443, 444 (1987). " 'This inherently imprecise calculation depends on careful analysis of the facts in each case," and must ultimately be within "a reasonable range.' " Sinkov v. Americor, Inc. , 419 F. App'x 86, 93 (2d Cir. 2011) (quoting Attridge v. Cencorp Div. of Dover Techs. Intern., Inc. , 836 F.2d 113, 117 (2d Cir. 1987) ). Because each situation differs so substantially, published cases cannot be easily characterized or categorized. By way of example, in Huthmacher v. Dunlop Tire Corp. , 309 A.D.2d 1175, 765 N.Y.S.2d 111, 113 (2003), the Appellate Division found that a $1 million award was excessive for a decedent who spent ten days hospitalized "at the boundary between coma and non-coma" during a 69-day hospital stay. The Second Department reduced a pain and suffering verdict of $900,000 to $450,000 for an individual who lapsed into a coma, but remained conscious for several days. Ramos v. Shah , 293 A.D.2d 459, 740 N.Y.S.2d 376, 377 (2002). On the other hand, the Second Department affirmed an award for conscious pain and suffering of $3,750,000 for a decedent who remained conscious while hospitalized through three and a half days prior to death. Hyung Kee Lee v. New York Hosp. Queens , 118 A.D.3d 750, 987 N.Y.S.2d 436, 440 (2014). Again, these cases provide very general guideposts in considering the claim of Ms. Poojari, whose diagnosed afflictions were so extensive that, by necessity, the damage award chart only contains a sampling of the nearly three dozen serious injuries she sustained. DE 199.
The claim regarding Ms. Chen, a situation in which there is simply no evidence about how long she survived the crash-and, as noted, the inference may be drawn that she did not-presents a different situation. "Without legally sufficient proof of consciousness following an accident, a claim for conscious pain and suffering must be dismissed." Cummins v. County of Onondaga , 84 N.Y.2d 322, 325, 618 N.Y.S.2d 615, 642 N.E.2d 1071 (1994). In Keenan v. Molloy , 27 N.Y.S.3d 73, 74, 137 A.D.3d 868 (2016), the Second Department reviewed a jury verdict arising from an accident in which a 65-year-old woman was struck and killed by a bus. The evidence of post-impact consciousness consisted only of conflicting expert opinions and the jury awarded no damages for pre-impact terror or conscious pain and suffering. The Appellate Division refused to disturb the verdict, finding it not inconsistent with the evidence. Id.
Claimants Ge and Huan Juan Guo
Claimants Allan Ge and Huan Juan Guo, both New York residents, did not appear in person or via letter, phone, video or attorney proffer. The Court has received and reviewed voluminous medical records concerning these two individuals. Mr. Ge was treated at Christiana Care Emergency Department, the local hospital that treated nearly all of the claimants, for a dislocated shoulder which was repaired, apparently satisfactorily, with a closed reduction and a minor head injury requiring no treatment. The total hospital bill was under $5,000, and he was discharged the same day.
In this process, though, the Court has been presented with a series of evaluations, *253 tests, examinations and (generally conservative) treatments from several medical providers that began in the months following the accident. Ultimately, he was subjected to an arthroscopic repair of the affected shoulder. More concerning, however, is the incurrence of well over $100,000 in medical costs, including liens totaling $83,000 (which may be improperly asserted here).[6] These costs seem highly disproportionate to the injury sustained, particularly on a relative basis.[7] Lacking sufficient evidence to make a reasoned causation determination concerning these medical costs, the award for Mr. Ge is limited to the severity of the injuries as evaluated and treated by Christiana Care. The Court has also awarded him lost income established through persuasive documentary evidence.
Ms. Huan Juan Guo was not treated the day of the accident, but sought medical evaluation at St. Francis Hospital in Delaware the following day. Following extensive testing, she was diagnosed with several contusions. The bill for treatment there totaled approximately $11,000. Returning to New York, she was seen by several other medical providers, and may have sustained a related rib fracture. Nevertheless, one of the New York medical providers declared her unfit to return to work, and she seeks compensation for more than $40,000 in lost income from 2014 through 2016. Moreover, the total medical expenses have risen to approximately $25,000 with a purported lien of over $4,000. Because the documentary evidence does not appear to justify any substantial lost income claim, in fixing damages for Ms. Guo the Court has disregarded lost income and calculated an amount based solely upon the injuries as described with associated emotional impact.
Any other result would be irresponsible and unfair to the remaining claimants.
Fixing the Damage Awards
Based on the rulings above, and after considering the volume of evidence and information presented, the Court makes the following determinations concerning the injuries sustained and the sums to be awarded. As discussed further herein, because the total damages sustained exceeds the $5 million fund, each claimant will be awarded a pro rata portion-totaling approximately 54%-of the damages found.
*254 Principal Injuries[8] Pecuniary Intangible Total Pro Rata Losses[9] Losses Damages Share of including Pain Fixed Fund Claimant Name Age & Suffering/Emotional Injury[10] Complex clavicle $15,000 $65,000 $80,000 $43,152.30 fracture with (projected conservative future ABDYMADIYEVA, treatment, resolved surgery) ARILYN 20 brain hemorrhage, facial scarring, some back pain. Hospitalized for six days. Injury to back, face, $4,200 $28,000 $32,200 $17,368.80 thigh and wrist (requiring stiches). AGUILAR, SARA 53 Adverse reaction to medication. Scarring. Anxiety. Infection and lost strength in left hand.
[Editor's Note: The preceding image contains the references for footnotes[8] ,[9] ,[10] ]
*255 Soft tissue injury with $6,000 $6,000 $3,236.42 ALBU, SORINA 24 some back pain, largely resolved and anxiety. Death. Observers $5,600 $1 million $1,005,600 $542,424.37 report claimant (funeral conscious while expenses. pinned under bus No BASHI, IDIL 30 awaiting help. Died established after multiple lost income) surgeries approximately 6.5 hours after accident. Scalp laceration $32,000 $32,000 $17,260.92 BOZDAG, ESIN 21 requiring staples. Anxiety. Multiple fractures of $75,000 $75,000 $40,455.28 back and ribs with BRANDISAUSKAI accompanying lung TE, KRISTINA 23 damage requiring five months of conservative treatment in US. Surface abrasion to $5,000 $5,000 $2,697.02 CALIN, MARIA 23 shoulder, anxiety. Death. Pronounced $387,000 n/a $387,000 $208,749.24 dead at scene nearly (lost income, 2.5 hours after household accident from services and CHEN, HUA YU 54 numerous blunt-force funeral injuries to head, chest expenses) and back along with internal injuries. No evidence concerning precise time of death. Husband of $22,220 $150,000 $172,220 $92,896.11 Kerchouch. Broken (loss of ribs, internal injuries, promotion)[11] cuts to arm, scarring, FELLAHI, KARIM 36 some loss of muscle strength. Significant emotional injury based upon injury to self and wife during honeymoon.
[Editor's Note: The preceding image contains the reference for footnote[11] ]
*256 GAJAWANDA, Concussion, fractured $13,000 $15,000 $28,000 $15,103.30 ARUN 38 ribs. Back pain and (lost wages) anxiety. Left shoulder $12,300 $8,000 $20,300 $10,949.90 dislocation with surgical repair; GE, ALLAN 26 cervical spine herniation; disc bulge; laceration to face with scarring. Surgical removal of $875 $30,000 $30,875 $16,654.09 foreign object (misc. GOK, AHMET 24 embedded in arm. expenses) Permanent, serious scarring; anxiety Contusions, small rib Lost income $2,500 $2,500 $1,348.51 GUO, HUAN-JUAN 57 fracture. not established Admitted to hospital $10,000 $10,000 $5,394.04 with chest pain, leg pain and inability to walk for two-day stay. Significantly GUO, HUAN-ZI 73 elevated heart rate due to anxiety. Testing largely negative; some residual headaches and anxiety. Post-concussion $15,000 $15,000 $8,091.06 GURBUZ, syndrome, pain, loss MEHMET 20 of consciousness and scarring. Fractured clavicle, $36,000 $36,000 $19,418.53 GURKSNYTE, multiple lacerations AGNE 23 including sutures, concussion, lung damage Ejected from bus. $160,000 $1.2 million $1,360,000 $733,589.05 Right (dominant) arm (est. lost mutilated with bones wages and exposed, saved after future multiple surgeries but medical KERCHOUCH, permanently locked at treatment) IHSSENE 29 90 d. angle, with almost no feeling or ability to use. Both clavicles broken. Substantial scarring and reproductive *257 complications. Extensive hospital stay. Significant emotional injury based upon injury to self and husband during honeymoon. Rib and hip fractures, $1,400 $25,000 $26,400 $14,240.23 LAGISHETTY, lacerations, some (unpaid KRISHNAIAH 55 surgical intervention. medical expense) Orbital fracture. $15,000 $45,000 $60,000 $32,364.22 Blurred vision with (lost wages LAGISHETTY, no history of vision and future SHILPA 31 problems. medical Headaches, expenses) depression and anxiety. Lost consciousness $70,000 $70,000 $37,758.26 during accident, MACIAS, JANE 57 fractures to clavicles, ribs, cervical spine. Herniated discs. Scarring, headaches. Suffered traumatic $150,000 $500,000 $650,000 $350,612.41 brain injury, severe (estimated cervical injury with lost past and permanent loss of future range of motion, wages) MACIAS, SERGIO 63 significant fractures, soft tissue injuries and related anxiety. Claimant awarded full disability by SSA from employment as taxi driver. Post traumatic coma. $20,000 $220,000 $240,000 $129,456.89 Brain injury and (lost wages) orbital fracture resulting in 15 day MANTILLA, hospitalization and ELVIA ORDONEZ 61 vision problems. Cervical spine injury. Facial scarring. Related anxiety and PTSD. MANTILLA, Claimant suffered $85,000 $900,000 $985,000 $531,312.66 GLADYS 58 from extensive and (estimated ORDONEZ severe fractures lost wages, requiring surgical home *258 intervention, alterations, including permanent and care installation of 9" costs) screws through pelvis and intrusive hardware in shoulder. 27 day hospital stay. Can walk only with difficulty using cane and walker. Forced to retire from job as school counselor; requires home care and alterations to residence. Separated shoulder $10,000 $10,000 $5,394.04 PATEL, AMIR 20 with closed reduction, anxiety. Facial lacerations $4,600 (lost $32,000 $36,600 $19,742.18 PATEL, NISAR 53 requiring sutures, personal back pain, extensive property) scarring Fractured wrist and $3,000 $160,000 $163,000 $87,922.80 elbow, tom rotator (home care PATEL, SHAMIN 46 cuff, multiple assistance) surgeries and some loss of function. Death. Claimant $343,300 $1.8 million $2,143,300 $1,156,103.97 succumbed to numerous severe injuries (e.g. liver lacerations) following extensive surgical POOJARI, intervention, JYOTSNA 43 including splenectomy and brain surgery, after 11 days of hospitalization with periods of consciousness. Complex fractures, $100,000 $250,000 $350,000 $188,791.30 shoulder injury (anticipated requiring surgical surgery) repair, lung damage, SEKER, MELIS 19 loss of use of hand and arm for two years, loss of semester at college, anxiety. *259 Soft tissue injury to $2,000 $21,000 $23,000 $12,406.29 SHAIKH, SAMIR 36 chest, hip and (household shoulder. Residual assistance) back pain. Severely fractured $40,000 $40,000 $21,576.15 finger requiring surgically implanted SHAIKH, pins with permanent SHAGUFTA 28 disfiguration. Some neurological issues and anxiety. Multiple severe $140,000 $140,000 $75,516.52 fractures including shattered hip, SIMONOSKA, requiring use of MARJA 24 wheelchair and walker. Facial scarring around eye and on chin. Mangled arm, injuries $50,000 $500,000 $550,000 $296,672.04 to leg and ear (including requiring four anticipated surgeries incl. nerve lost income SOLORORZANO, graft during several and future CECILIA 59 month hospital stay. medical Extensive scarring. bills) Possible future surgeries. Lost ability to work. SOLORZANO, PTSD and Anxiety $5,000 $5,000 $2,697.02 DORISBETH 53 Injury to neck with $5,000 $5,000 $2,697.02 S.S. 6 anxiety. M.S. 2.5 Anxiety $2,500[12] $2,500 $1,348.51 Soft tissue injury to $50,000 $50,000 $26,970.19 neck, back and THAKKAR, shoulder resulting in BHARATI 47 permanent limitation to range of motion. Lower back fracture, $8,000 $8,000 $4,315.23 TIET, ALAN T. 55 conservative treatment
[Editor's Note: The preceding image contains the reference for footnote[12] ]
*260 Abrasions and back $5,000 $5,000 $2,697.02 TIET, ARIEL 19 pain Concussion and $20,000 $20,000 $10,788.07 TIET, CONNIE 19 stitches Contusions and $5,000 $5,000 $2,697.02 TIET, JANICE 55 sprains Permanent scarring $14,000 $14,000 $7,551.65 TOPUZOVA, ANA 22 and anxiety. Disc herniation in $30,000 $30,000 $16,182.11 VADDEY, PADMA 55 back and neck. Conservative treatment and anxiety. Scapula and rib $100,000 $100,000 $53,940.37 VADDEY, fractures, lacerations VENKATA 63 and anxiety Compression fracture $4,000 (lost $80,000 $84,000 $45,309.91 at L-4, rib fractures, earnings) WARREN, ANNE 59 lung injury, anxiety, months of treatment in US. Multiple fractures of $6,000 $150,000 $156,000 $84,146.98 pelvis and ribs (lost WHITAKER, requiring temporary income) KERRY 60 use of wheelchair; spinal fusion. Soft tissue injury, lacerations and anxiety.
Consistent with the above findings, the Clerk of the Court is respectfully directed to issue payment to counsel for each of the above-listed claimants in the amounts listed above. While the Clerk had been directed to hold the funds in an interest-bearing account, the funds have been held for such a short period that the amount of interest accrued represents a negligible amount which cannot be efficiently distributed. As such, consistent with the doctrine of cy pres , the Clerk is directed to distribute any accrued interest to the Christiana Care Health System, a not-for-profit, non-sectarian health system that provided care for nearly all of the victims of the crash. See Christiana Care Health System, https://christianacare.org (last visited May 16, 2017).
So Ordered.

Importantly, though, for these purposes, only Ms. Bashi's estate is a claimant in this matter.

New York law also allows for the award of punitive damages, but the record here cannot support such an award.

"The correct way to conduct a choice-of-law analysis is to consider each plaintiff vis-à-vis each defendant." Edwards v. Erie Coach Lines Co. , 17 N.Y.3d 306, 329, 929 N.Y.S.2d 41, 952 N.E.2d 1033 (2011).

Bill Marsh, Putting a Price on the Priceless: One Life , New York Times (Sept. 9, 2007), http://www.nytimes.com/2007/09/09/weekinreview/09marsh.html.

Marsh, supra note 4. Based on his experience in making these calculations, Kenneth Feinberg, one of the fund's administrators, later advocated for treating all lost lives equally, regardless of financial circumstances. Kenneth Feinberg, What Is the Value of a Human Life? , NPR (May 25, 2008), http://www.npr.org/templates/story/story.php?storyId=90760725.

While counsel for Mr. Ge has offered some documentary evidence relating to some of this treatment, it remains the Court's view that there is a substantial question as to whether the Worker's Compensation lien may be asserted here. See DE 200-1 at 3 ("[D]epending on the facts of this accident, the State Insurance Fund may be entitled to a lien ...."). Because the undersigned has expressly excluded the amounts paid by the State Insurance Fund largely for medical procedures performed 9 to 21 months after the accident, it would seem inappropriate to assert a lien against the award herein.

Counsel also raises a private lien being asserted by an anesthesia group of more than $7,000. DE 200 at 2. Even the sparse documentary record before the Court tends to confirm the impression that the charges incurred are disproportionate. See DE 200 at 2 (disallowing as excessive all but $400 of $3,400 charge).

For avoidance of doubt, I have not documented all of claimants' complaints and injuries in this summary chart. Rather, the listing here summarizes the primary injuries sustained to offer some insight into the damages calculation.

The figures provided here should not be viewed as a precise measure of pecuniary losses. In working through this matter, without the benefit of a complete trial record or expert economic analysis, the undersigned has attempted to provide a reasonable estimate of unreimbursed out-of-pocket expenses, lost income, and future anticipated needs for certain medical needs, including, where adequately demonstrated, reasonably expected costs. Given the nature of the proof, which included testimony concerning lost jobs, reduced earning capacity and so forth, and given the differing resources in different countries for such items as pensions, medical coverage, costs and the like, different considerations went into each claimant's estimate.

Because the task at hand involved equitable distribution of a fixed fund, the undersigned was concerned only with relative damages rather than absolute damages. In many instances, the undersigned employed a multiple of ascertainable medical expenses to generate a reasonable estimate of pain and suffering and emotional injury. This could not be done formulaically, however, as each figure had to be adjusted for individual circumstances, and in some cases the medical costs were either unrepresentative or incomplete. Importantly, because certain claimants are engaged in litigation elsewhere, it should be recognized that these figures were generated from a truncated evidentiary process and a necessarily incomplete record. Therefore, the figures presented here should not be accorded any evidentiary or preclusive effect.

The figures for claimants Fellahi and Kerchouch exclude significant unpaid medical expenses, as such expenses seem unlikely to be collected.

SS and MS, minor children of Samir Shaikh, are subject to the rules of infant compromise approvals. Counsel will submit the appropriate documents to the undersigned for final approval before disbursement.